Ronald H. RILEY, Individually, Plaintiff–Appellant,

v.

KINGSLEY UNDERWRITING AGENCIES, LTD., a British corporation, Lime Street Underwriting Agencies, Ltd., a British corporation, Bankside Syndicate Limited, a British corporation, FirstBank of Vail, N.A., Robin C. Kingsley, Robert Hallam, Society and Council of Lloyd's and John Does I Through X, Defendants–Appellees.

No. 91–1311.

United States Court of Appeals, Tenth Circuit.

July 17, 1992.

Richard G. Sander (George G. Ventura, with him on the brief), both of Popham, Haik, Schnobrich & Kaufman, Ltd., Denver, Colo., for plaintiff-appellant.

Neil Peck (and Thomas S. Nichols & Linda Wackwitz, all of Davis, Graham & Stubbs, Denver, Colo., and Taylor R. Briggs, Sheila H. Marshall & Mary L.B. Betts, of LeBoeuf, Lamb, Leiby & MacRae, New York City, with him on the brief), for defendants-appellees.

Before McKAY, Chief Judge, LOGAN and KELLY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

Plaintiff–Appellant, Ronald H. Riley (Riley) filed suit in federal district court asserting claims under federal and state securities laws, as well as state tort law. Named defendants were Society and Council of Lloyd's, a British entity (Lloyd's); Kingsley Underwriting Agencies, Ltd. (Kingsley Underwriting), Lime Street Underwriting Agencies, Ltd. (Lime Street Underwriting), and Bankside Syndicate, all British corporations (Underwriting Defendants); Robin C. Kingsley (Kingsley) and Robert Hallam (Hallam), both British citizens, and FirstBank of Vail, N.A. (FirstBank). Defendants, other than FirstBank, purported to enter a special appearance to raise the following questions: (1) whether choice of forum and law provisions in Riley's contract with Lloyd's were valid and enforceable, and (2) whether arbitration and choice of law provisions in Riley's con-

tract with the Underwriters, requiring arbitration in England and application of English law, were valid and enforceable. The district court held that the arbitration and choice of forum and law provisions in the contracts were valid and enforceable. After concluding it lacked further jurisdiction, the district court dismissed all of Riley's claims, without prejudice.

After filing his appeal, Riley moved for an injunction pending appeal to prohibit Lloyd's from drawing on certain letters of credit. Three days later, we issued an order granting the motion, denying an immediate hearing and accelerating oral argument. For the reasons discussed below, the district court's judgment dismissing Riley's claims is affirmed and our injunction pending appeal is dissolved.

### Background

In order to understand the operative facts, a brief description of the parties is necessary. All parties, save Riley and FirstBank, are British citizens or entities. Kingsley Underwriting is a predecessor in interest to Lime Street Underwriting. Both are registered underwriting agencies with Lloyd's. Bankside Syndicate, Ltd. is a registered managing agent with Lloyd's and conducts the day-to-day business of Lime Street. Kingsley was the chairman of Lime Street at one time and formerly the chairman of the Kingsley Underwriting. Hallam is the current Director of Lime Street and past Director of Kingsley Underwriting. Lloyd's is a British corporation with its principal place of business in London. Lloyd's was incorporated in 1891, but it has functioned as a market for writing insurance policies for some 300 years.

Riley was interested in becoming a member of Lloyd's and travelled to England on several occasions to pursue this quest. While there, Riley visited with various persons, including Hallam and Kingsley. In January 1980, Riley entered into a General Undertaking with Lloyd's and a Members' Agent's Agreement with the Underwriters. Both of these agreements provided that the courts of England would have exclusive jurisdiction over any dispute and that the laws of England would apply.[1,2] Additionally, the Members' Agent's Agreement provided for arbitration in the event of any dispute.[3]

1. The General Undertaking agreement provided:
   2.1 The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.
   2.2 Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding (together in this Clause 2 referred to as "Proceedings") arising out of or relating to such matters shall be brought in such courts and, to this end, each party hereto irrevocably agrees to submit to the jurisdiction of the courts of England and irrevocably waives any objection which it may have now or hereafter to (a) any Proceedings being brought in any such court as is referred to in this Clause 2 and (b) any claim that any such proceedings have been brought in an inconvenient forum and further irrevocably agrees that a judgment in any Proceedings brought in the English courts shall be conclusive and binding upon each party and may be enforced in the courts of any other jurisdiction.
   2.3 The choice of law and jurisdiction referred to in this Clause 2 shall continue in full force and effect in respect of any dispute and/or controversy of whatsoever nature arising out of or relating to any of the matters referred to in this Undertaking notwithstanding that the Member ceases, for any reason, to be a member of, or to underwrite insurance business at, Lloyd's.

2. The Members' Agent's Agreement provided:
   18. Governing Law and Jurisdiction.
   18.1 This agreement is governed by, and shall be construed in accordance with the laws of England.
   18.2 Each of the parties hereby irrevocably submits for all purposes of and in connection with this Agreement to the exclusive jurisdiction of the courts of England.

3. The Members' Agent's Agreement provided:
   15. Arbitration.
   15.1 Subject to Clause 15.3, any dispute, difference, question or claim relating to this Agreement which may arise between the Agent and the Name shall be referred at the request of either party to arbitration in London by a sole arbitrator to be appointed, in default of agreement between the parties, by the Chairman or a Deputy Chairman of Lloyd's for the time being.

Riley's underwriting began in January 1980 with a premium income limit of 150,-000 pounds. He remained a member of Lloyd's through 1990, and each year increased the amount of premium income underwritten. By 1989, Riley was underwriting premium income in excess of a million pounds.

In connection with his underwriting, Riley was required to meet Lloyd's deposit requirements. Riley obtained letters of credit from FirstBank. FirstBank in turn issued letters of credit to First National Bank of Boston (Guernsey) Ltd. as security for a letter of credit to be issued by the London branch of the Guernsey Bank in favor of Lloyd's. Lloyd's holds these letters of credit as trustee of a trust for the benefit of Riley's insured policy holders. In the event a member fails or refuses to cover his pro rata share of underwriting liability, then Lloyd's may draw on the letter of credit to cover the obligation. In the event the letter of credit is insufficient, Lloyd's will look to a member's assets to satisfy any remaining underwriting liability.

The syndicates in which Riley participated have experienced large losses, resulting in calls in excess of 300,000 pounds. Riley has been notified that, if he does not satisfy the calls, Lloyd's will draw against the letter of credit issued by Guernsey Bank. Guernsey Bank would then draw on the FirstBank letters of credit.

Proceeding apparently on the theory that the best defense is a good offense, Riley filed this action seeking declaratory judgment, rescission and damages against Defendants other than FirstBank. Riley claimed that these Defendants engaged in the offer and sale of unregistered securities and made untrue statements of material fact and material omissions in connection with the sale of securities, violating the Securities Act of 1933 (1933 Act), §§ 12(1) & 12(2), 15 U.S.C. §§ 77l(1) & 77l(2), the Securities Exchange Act of 1934 (1934 Act), § 10, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. 240.10b–5. Additionally, Riley made similar allegations under state securities law, *see* Colo.Rev.Stat. §§ 11–51–107 & 11–51–125 (1987), and alleged common law fraud. Riley sought a writ of attachment against Lloyd's and an injunction to prevent Defendants from drawing on the letters of credit.

Riley obtained a temporary restraining order from the district court ex parte. Prior to a preliminary injunction hearing, Riley, Lloyd's, the Underwriting Defendants, Kingsley and Hallam entered into a court-approved stipulation that the hearing would be limited to the threshold issues of the applicability and effect of the forum selection clause and the arbitration clause discussed above. Defendants specifically reserved their lack of in personam jurisdiction defense.

## Discussion

■ A motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3). *Spradlin v. Lear Siegler Mgmt. Servs.*, 926 F.2d 865, 866 (9th Cir.1991); *Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A.*, 867 F.2d 697, 698 (D.C. Cir.1989); *Medoil Corp. v. Citicorp*, 729 F.Supp. 1456, 1457 n. 1 (S.D.N.Y.1990). *But see David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 253 n. 2 (2d Cir.) (arbitration provision; motion to dismiss for lack of subject matter jurisdiction), *cert. dismissed,* —— U.S. ——, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991). The enforceability of forum selection, choice of law and arbitration provisions are questions of law which we review de novo. *See Milk 'N' More v. Beavert*, 963 F.2d 1342, 1345 (10th Cir.1992). We hold that the parties must abide by their agreement and resolve their disputes in England, either before an English court or arbitrator, as the case may be. Three reasons persuade us: (1) the parties' undertaking is truly international in character, (2) all parties other than Riley and FirstBank are British, and (3) virtually all activities giving rise to the suggested claims occurred in England.

A. Forum Selection and Choice of Law Provisions.

Riley concedes, as he must, that "the enforcement of choice of forum and choice

of law clauses is consistent with recent U.S. Supreme Court decisions." However, he relies on an isolated sentence in a footnote in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 3359 n. 19, 87 L.Ed.2d 444 (1985), which stated that forum selection and choice of law provisions which operate as prospective waivers of statutory antitrust claims would not be enforced as against public policy. Riley suggests that he is being deprived of all substantive rights under the federal securities laws and therefore should be relieved of his agreements on public policy grounds.[4] On these facts, we do not read *Mitsubishi* as restrictively as Riley when *Mitsubishi* is viewed against the backdrop of Supreme Court decisions in the area.

When an agreement is truly international, as here, and reflects numerous contacts with the foreign forum, the Supreme Court has quite clearly held that the parties' choice of law and forum selection provisions will be given effect. *See Carnival Cruise Lines, Inc. v. Shute*, —— U.S. ——, ——–——, 111 S.Ct. 1522, 1527–28, 113 L.Ed.2d 622 (1991); *Mitsubishi*, 473 U.S. at 631, 105 S.Ct. at 3356; *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519–20, 94 S.Ct. 2449, 2457–58, 41 L.Ed.2d 270 (1974); *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513 (1972). We review these authorities briefly.

In *M/S Bremen*, the Court identified an important rationale for the rule that such provisions should be enforced.

> The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. .... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

*Id.*, 407 U.S. at 9, 92 S.Ct. at 1912. The Court concluded:

> Thus, in the light of present day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside.

*Id.* at 15, 92 S.Ct. at 1916. Forum selection provisions are "prima facie valid" and a party resisting enforcement carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances. *See Id.* at 10, 15, 92 S.Ct. at 1913, 1916; *Seward v. Devine*, 888 F.2d 957, 962 (2d Cir. 1989).

The Court adhered to this position in *Scherk*, which dealt with the applicability of an arbitration provision requiring that any disputes be referred to arbitration before the International Chamber of Commerce in Paris, France, applying Illinois law. Although an arbitration provision was involved, the Court characterized it as "a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk*, 417 U.S. at 519, 94 S.Ct. at 2457. The Court characterized the agreement at issue as "a truly international agreement" and discussed why these types of provisions are so important in the context of international transactions.

> A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.

*Scherk*, 417 U.S. at 516, 94 S.Ct. at 2455–56. In passing, the Court noted that desig-

---

4. We need not decide whether Riley's participation as a Name constitutes a security, or whether Lloyd's or the Defendant Underwriters are subject to the provisions of the 1933 or 1934 securities acts.

nating a particular place for arbitration might, under some circumstances, be viewed as an implicit choice of law selection. *Id.* at 519 n. 13, 94 S.Ct. at 2457 n. 13.

In *Mitsubishi,* the Court upheld a provision that would result in antitrust claims being subject to arbitration in Japan on the basis

> that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, *even assuming that a contrary result would be forthcoming in a domestic context.*

*Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355 (emphasis supplied).

Finally, in *Carnival Cruise Lines,* the Court relied on *M/S Bremen* in enforcing a domestic forum selection clause, despite inconvenience to the plaintiffs. *Carnival Cruise Lines,* 111 S.Ct. at 1528. Only a showing of inconvenience so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice, would be sufficient to defeat a contractual forum selection clause. *Id.*

Riley suggests that enforcement of the choice of forum and law provisions is unreasonable because he effectively will be deprived of his day in court. The basis underlying this contention is his perception that recovery will be more difficult under English law than under American law. Riley will not be deprived of his day in court. He may, though, have to structure his case differently than if proceeding in federal district court. The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair. *See Carnival Cruise Lines,* 111 S.Ct. at 1528; *AVC Nederland B.V. v. Atrium Inv. Ptrshp.,* 740 F.2d 148, 158–59

(2d Cir.1984); *Medoil Corp.,* 729 F.Supp. at 1460; *Karlberg European Tanspa, Inc. v. Jk-Josef Kratz Vertriebsgesellschaft mbH,* 618 F.Supp. 344, 348 (N.D.Ill.1985); *Dukane Fabrics Int'l Inc. v. M.V. Hreljin,* 600 F.Supp. 202, 203–04 (S.D.N.Y.1985). English law does not preclude Riley from pursuing an action for fraud and we agree with the Defendants that the Lloyd's Act does not grant statutory immunity for such claims. *See* Lloyd's Act, § 14(3), Aplt.App. at 286 & Aple.Add. at 307–08. We have been shown nothing to suggest than an English court would not be fair, and in fact, our courts have long recognized that the courts of England are fair and neutral forums. *See M/S Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914; *Syndicate 420 at Lloyd's London v. Early American Ins. Co.,* 796 F.2d 821, 829 (5th Cir.1986); *Bonny v. Society of Lloyd's,* 784 F.Supp. 1350, 1353 (N.D.Ill.1992). Given the international nature of the insurance underwriting transaction, the parties' forum selection and choice of law provisions contained in the agreements should be given effect.

## B. The Arbitration Agreement.

Any discussion regarding the efficacy of an agreement to arbitrate in a foreign country between citizens or entities of different countries must begin with a review of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention), 9 U.S.C. § 201 note. The Convention was ratified by the United States for differences arising out of commercial legal relationships and it became effective on December 29, 1970. The United Kingdom and the United States are Contracting States to the Convention. Of course, the ratification of the Convention makes it part of the supreme law of the land, as enforceable as Congressional enactments. *See* U.S. Const. art. VI, cl. 2. *See also Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.,* 767 F.2d 1140, 1145 (5th Cir.1985); *Filanto, S.p.A. v. Chilewich Int'l Corp.,* 789 F.Supp. 1229, 1231 (S.D.N.Y.1992) The Convention plainly applies to this commercial transaction.

Article II of the Convention[5] imposes a mandatory duty on the courts of a Contracting State to recognize, and enforce an agreement to arbitrate unless the agreement is "null and void, inoperative or incapable of being performed." 9 U.S.C. § 201 note, art. II(3). Following the plain language of the Convention, the First Circuit has framed the very limited inquiry a court should perform when presented with a request to refer an international dispute to arbitration:

(1) Is there an agreement in writing to arbitrate the subject of the dispute?

(2) Does the agreement provide for arbitration in the territory of the signatory of the Convention?

(3) Does the agreement arise out of a legal relationship whether contractual or not, which is considered as commercial?

(4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states?

*Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186–87 (1st Cir.1982) (citations omitted). If these questions are answered in the affirmative, a court is *required* to order arbitration. *Id.* at 187. That is the situation in this case. Only if a court finds that the agreement "null and void, inoperative or incapable of being performed," Convention, art. II(3), may it act to the contrary. *Id.*

Riley argues that the "null and void" exception applies. His argument is that the agreement requiring arbitration should be held void as against public policy because several of his claims are grounded in the 1933 and 1934 securities acts, and the application of English law would result in a waiver of certain provisions of those acts. We disagree. As stated by the Court:

A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages. .... [T]he dicey atmosphere of such a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements.

*Scherk,* 417 U.S. at 516–17, 94 S.Ct. at 2455–56 (footnote omitted). *Scherk* is persuasive authority in this case because it involved a claimed waiver of a 1934 Act provision. The Court did not reach whether the Convention would require enforcement of the arbitration provision, *see* 417 U.S. at 520 n. 15, 94 S.Ct. at 2457 n. 15, but nonetheless in the securities context held:

that the agreement of the parties in this case to arbitrate any dispute arising out of their international commercial transaction is to be respected and enforced by the federal courts in accord with the explicit provisions of the Arbitration Act.

417 U.S. at 519–20, 94 S.Ct. at 2457 (footnote omitted).

Likewise, in *Mitsubishi,* the Court relied on the strong federal policy favoring arbitration:

"questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...."

**5.** Article II provides:

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange or letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

473 U.S. at 626, 105 S.Ct. at 3353 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983)).

Given this policy and the policy of signatory nations to the Convention which presumes the enforceability of arbitration agreements, we agree with the Third Circuit and its reasoning to the effect that the "null and void" exception in the Convention is to be narrowly construed. *Rhone Mediterranee Compagnia v. Lauro*, 712 F.2d 50, 53 (3rd Cir.1983). *See also Ledee*, 684 F.2d at 187; *Meadows Indem. Co. v. Baccala & Shoop Ins. Serv., Inc.*, 760 F.Supp. 1036, 1043 (E.D.N.Y.1991). *Scherk* also leads to the same conclusion, a conclusion further reinforced by Article V(2)[6] of the Convention, which specifically provides for relief when enforcement of an award in violation of public policy is sought.

Riley also suggests, in argument before the district court and on appeal, that all of the choice provisions were induced by fraud, including the arbitration provision. Riley's argument does not persuade us. First, Riley's complaint alleges that he was induced generally to enter the contracts in question as a result of fraud. Aplt.App. at 18 (complaint ¶¶ 118–122). However, Riley never pleaded that the *specific* choice provisions at issue were obtained by fraud. A plaintiff seeking to avoid a choice provision on a fraud theory must, within the confines of Fed.R.Civ.P. 9(b) and 11, plead fraud going to the specific provision; the teachings of *Scherk*, interpreting *M/S Bremen*, require no less. *See Scherk*, 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (the fraud exception "means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion"); *M/S Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916 (*clause* must be invalid due to fraud or overreaching). Second, a claim of fraud in the inducement may be resolved by arbitration. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). Third, at no time did Riley offer any evidence on the stipulated issues tending to show that *the arbitration provision* (or any other choice provision, for that matter) was a product of fraud or coercion. *See Carnival Cruise Lines*, 111 S.Ct. at 1528 ("there is no evidence that petitioner obtained respondents' accession to the forum clause by fraud or overreaching"); *Spradlin*, 926 F.2d at 868 (broad and conclusory allegations of fraud without specific factual allegations or evidentiary support are insufficient to invalidate forum selection clauses); *Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.*, 741 F.2d 273, 280 (9th Cir.1984) (party seeking to avoid forum selection clause "submitted no significant probative evidence tending to support a claim of adhesion").

Finally, Riley's suggestion that everyone in England will be biased against him has no basis in the record and we will not assume that Riley would get anything other than a full and fair hearing. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 479, 109 S.Ct. 1917, 1920, 104 L.Ed.2d 526 (1989); *Mitsubishi*, 473 U.S. at 634, 105 S.Ct. at 3357; *Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 515 (9th Cir.1988); *Syndicate 420*, 796 F.2d at 829.

The district court's order is AFFIRMED.

---

**6.** Article V(2) of the Convention provides:
Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that county [sic]; or
(b) the recognition or enforcement of the award would be contrary to the public policy of that country.