GOODWIN, Circuit Judge,
Concurring and Dissenting:
I would affirm the judgment dismissing the action pursuant to Fed.R.Civ.P. 12(b)(3). The Choice Clauses are valid and are not preempted by extraterritorial application of the United States securities laws.
Appellants, all citizens or residents of the United States, claim that Section 14 of the 1933 Act and Section 29a of the 1934 Act, give them the right to repudiate their insuring agreements. Section 14 reads:
Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.
The key question is whether the transactions described in the complaint made the appellants “persons acquiring any security.” The majority concludes, without deciding, whether these foreign insurance undertakings are securities, that the appellants haye brought themselves within the protection of a law designed to protect domestic investors from being victimized by combinations of their own greed and the artifices of sellers of investment schemes. The majority holds that just because the Appellants alleged in their complaint that they were “persons acquiring any security,” United States securities law renders void the carefully written terms of the engagements by which the Appellants brought themselves into the English insurance underwriting scheme popularly known as “Lloyd’s of London.”
The same reasoning would bring protections under our securities laws to any one who loses his or her savings betting on chicken fights in Zamboanga. An American could simply allege she had purchased a security, and thus repudiate any contractual obligations entered into around the world. There must be some limit to the reach of the United States government as nanny.
There are a number of prudential reasons, based on the augmentation of trade, as well as domestic legal reasons, based upon United States precedent, why the majority’s willingness to jettison solemn international contracts, in order to pursue a perceived policy goal on the part of Congress must be called into question.
I accept, as one must for Rule 12(b)(3) purposes when examining pleadings, the majority’s statement of the facts. But the facts as pled do not compel the majority’s conclusions of law.
United States residents, having heard of the profits to be made and the risks to be run by investing in the worldwide underwriting pools in the peculiar form of risk insurance popularly known as Lloyd’s of London, wanted to become “Names” (hereinafter referred to as Names). They ventured their assets, as all Names must, and those who lost money sued. Those who did not lose money apparently have not sued, but may be waiting in the wings to see how this case comes out and to sue if they ever do lose money. It is precisely this effect on the worldwide insurance business, and upon other international contracts, that makes this case strange, and troubling.
The Appellants did not sue in the courts of the United Kingdom, which they solemnly agreed to do if they deemed themselves wronged. Instead, they sought out the courts of this circuit, and repudiated that *-152 part of their agreement with the defendants which the Appellants found inconvenient to their litigation strategy.
It appears from their complaint, and reference to English law, that if Appellants can prove their essential facts, English law would provide a plain, speedy, and adequate remedy for any fraud that was practiced upon them, and fraud is what they now say made their bargain improvident.
The majority virtually ignores the contracts the parties negotiated and executed, contractual undertakings without which their opportunity to venture their assets would not have been open. The majority also ignores the century of historic success the nation’s insurance lobby has enjoyed in keeping federal law largely out of the insurance business. It assumes that because the Appellants claimed they had acquired securities, the securities laws trumped all other law that might bear upon the subject at hand.
The implications of this holding on international business transactions are not likely to lubricate commerce. Therefore, I would follow the other circuits that have enforced the Names’ obligations to litigate their claims in the English courts. See Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir.1993), cert. denied, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953 (10th Cir.), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992); Shell v. R.W. Sturge, Ltd., 55 F.3d 1227 (6th Cir.1995); Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir.1996).
I. International v. Domestic
The Supreme Court indicated in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972) that forum selection clauses are presumptively valid where the underlying transaction is fundamentally international in character. This presumption also holds for actions under the securities acts. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). The majority seeks to weaken Scherk by treating the dispute in this case as basically domestic. While Appellants allege that they were solicited in the United States and many Appellants signed the General Undertaking in the United States, international traders sign documents every day and transmit signatures electronically overseas with the locus of the signing a wholly immaterial historical fact. Signing a document in a ski lodge in Austria does not bring Austrian law to bear upon all future disputes arising out of the document. These arguments rehearse the usual “points of contact” aggregation that occurs in interstate litigation within the United States when competing state laws are invoked by the parties and the court must choose the law to apply in a diversity case. This is a diversity cáse, but it is not a points of contacts case. The case is about international commerce.
Appellants also argue that the ROTA Committee meeting in England that all Names must attend is simply a formality that should not have presumptive weight in determining whether to characterize these transactions as international. Becoming a Name is not a matter of empty formality. The ROTA Committee meeting is an essential part of becoming a Member.
Whether solicited in California or in Hong Kong, the Names freely and voluntarily contracted to become members of an English insurance marketplace that underwrites insurance worldwide.[1] Subjecting Lloyd’s to the varying requirements of the different countries in which Names might reside would inject counterproductive uncertainty into the operation of the Lloyd’s marketplace. Such uncertainty interferes with the smooth functioning and growth of global commerce, see Bremen, 407 U.S. at 9, 92 S.Ct. at 1912-13, and destroys the predictability needed for *-151 financial planning and for the resolution of disputes. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985).
Lloyd’s structured its system to avoid this uncertainty and to create predictability through use of forum selection and choice-of-law clauses. See Scherk, 417 U.S. at 518, 94 S.Ct. at 2456-57; Roby, 996 F.2d at 1363. Further, international comity dictates that United States courts enforce choice-of-forum clauses out of respect for the integrity and competence of foreign tribunals. See Mitsubishi, 473 U.S. at 629, 105 S.Ct. at 3355. Finally, our failure to enforce the Choice Clauses could lead to “unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.” Scherk, 417 U.S. at 516-17, 94 S.Ct. at 2455-56. If Lloyd’s “had anticipated that [Appellants] would be able in this country to enjoin [enforcement of the forum selection clause, Lloyd’s] might have sought an order in [England] enjoining [Appellants] from proceeding with [their] litigation in the United States.” See id. at 517, 94 S.Ct. at 2456. In any event, without the certainty of the Choice Clauses, it is unlikely that Lloyd’s would engage to underwrite, at premiums anyone would pay, the kind of risks in the various venues of the earth in which losses could occur.
II. Are the Choice Clauses Unreasonable Under the Circumstances?
The presumption in favor of choice-of-forum clauses in international transactions can be overcome by a clear showing that the clauses are “unreasonable under the circumstances.” Bremen, 407 U.S. at 10, 92 S.Ct. at 1913. Forum selection clauses are unreasonable (1) if their incorporation into the agreement was the result of fraud or overreaching, Bremen, 407 U.S. at 12-13, 92 S.Ct. at 1914-15; (2) if the complaining party “will for all practical purposes be deprived of his day in court,” due to the grave inconvenience or unfairness of the selected forum, id. at 18, 92 S.Ct. at 1917-18; (3) if the fundamental unfairness of the chosen forum may deprive the plaintiff of a remedy, Roby, 996 F.2d at 1363; or (4) if the clauses contravene a strong public policy of the forum state, Bremen 407 U.S. at 15, 92 S.Ct. at 1916.
A. The Antiwaiver Provisions
In international agreements, the Supreme Court has enforced choice clauses even where similar agreements in purely domestic transactions might not be recognized. Still, the majority holds that the antiwaiver provisions and the securities laws embody a public policy offended by the Choice Clauses. However, none of the other courts of appeals that have addressed the enforceability of the Choice Clauses in the General Undertaking have failed to enforce the forum selection clause.[2] See Roby, 996 F.2d 1353; Bonny, 3 F.3d 156; Riley, 969 F.2d 953; Shell, 55 F.3d 1227; Allen, 94 F.3d 923. But see Leslie v. Lloyd’s of London, Civ.A. No. H-90-1907, 1995 WL 661090 (Aug. 20, 1995 S.D.Tex.).
It is true that none of the cited cases specifically addressed Appellants’ contention, and the majority’s holding, that the antiwaiver provisions explicitly prohibit the enforcement of the clauses. Rather, the courts "engaged in judicial balancing to determine whether enforcement of the clauses would contravene the strong public policy embodied in the antiwaiver provisions. Judicial balancing is the appropriate course.
The other courts of appeals, citing Bremen, have implicitly crafted an exception to the antiwaiver provisions in international agreements where the remedies available in the selected forum are sufficient to “deter issuers from exploiting American investors.” Roby, 996 F.2d at 1364; see Bonny, 3 F.3d at 161 (holding that so long as “remedies available in the selected forum [do not] subvert the public policy” of the securities laws the court will enforce the clauses). In Bremen, the Supreme Court enforced a choice-of-forum clause even though the English courts *-150 would give effect to an exculpatory clause in the contract that United States courts would not if the case arose in a domestic setting. Bremen, 407 U.S. at 15-16, 92 S.Ct. at 1916-17. The Court held that the “considerations with respect to the towage business strictly in American waters ... are not controlling in an international commercial agreement.” Id. Further, the Court quoted the dissent in the court of appeals stating that “we should not invalidate the forum selection clause here unless we are firmly convinced that we would hereby significantly encourage negligent conduct within the boundaries of the United States.” Id. at 16, 92 S.Ct. at 1916. Similarly here, we should not invalidate the Choice Clauses unless we are firmly convinced that England does not provide adequate remedies to deter fraud upon United States Names.
The majority disregards Bremen because it did not involve a federal statute but rather federal admiralty law. Bremen, however, does not rely on distinctions between statutory and judge made law. The Bremen Court stated that “[a] contractual choiee-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.” Bremen, 407 U.S. at 15, 92 S.Ct. at 1916 (emphasis added).[3] Also the majority attempts to argue that Scherk can be distinguished because the Court had a competing federal statute, the Arbitration Act, to reconcile with the securities laws. Scherk’s reliance on Bremen did not depend on the Arbitration Act. The Arbitration Act only placed arbitration provisions on equal footing with other contractual clauses, like choice-of-forum clauses. See Scherk, 417 U.S. at 511, 94 S.Ct. at 2453 (noting that the Arbitration Act puts arbitration agreements “upon the same footing as other contracts”); Cange v. Stotler & Co., 826 F.2d 581, 595 (7th Cir.1987) (Easterbrook, J., concurring) (“The Federal Arbitration Act was designed to reverse centuries of judicial hostility to arbitration not to make arbitration agreements more readily enforceable than other agreements.” (citations and internal quotations omitted)). It did not make arbitration clauses more binding than choice-of-forum clauses.
Further, in cases discussing the extraterritorial effect of the securities laws, courts have been careful to examine the policies of the securities acts before expanding the securities acts and violating notions of international comity. See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326 (2d Cir.1972); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).[4] Although not done explicitly, the other circuits have determined that if the policies of the securities acts were adequately protected abroad, then the antiwaiver provisions should not operate to invalidate forum selection and choice-of-law clauses and force U.S. laws on parties who have chosen other law. Given the active judicial role in determining the scope of the securities laws in international transactions, I believe we should follow the lead of the other circuits and enforce the clauses if remedies in England are adequate to serve the policies of the securities laws. See Roby, 996 F.2d at 1364. The Names did not expect more when they volunteered to sign the General Undertaking.
B. Public Policy of the Securities Acts
In this case, English law adequately protects the policies embodied in the securities laws. Appellants have alleged violations of sections 12(1) and 12(2) of the 1933 Act, 15 U.S.C. § 771(a), and section 10(b) and rule 10b-5 of the 1934 Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. These sections are aimed “at prospectively protecting American investors from injury by demanding ‘full and fair disclosure’ from issuers,” Roby, 996 F.2d at 1364, deterring fraud and manipulative *-149 practices in the securities markets, and compensating defrauded investors. See Randall v. Loftsgaarden, 478 U.S. 647, 664, 106 S.Ct. 3143, 3153-54, 92 L.Ed.2d 525 (1986). While English and American remedies are not identical, “the possibility of an unfavorable change in law” should not be dispositive unless the “remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all.” Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254-55, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981).[5] Though a difficult question, English remedies seem to serve these policies adequately.

1.Fraud and Manipulative Practices

English law provides remedies for fraudulent, negligent, and even innocent misrepresentation. Further, section 47 of the English Financial Services Act creates penalties for misleading statements or omissions made knowingly or recklessly. See Bonny, 3 F.3d at 161. “While the ... Names might have been able to sue ‘controlling persons’ under the United States securities laws and establish liability without proving reliance, it is not unfair for English law to require proof of actual misconduct and reliance.” Roby, 996 F.2d at 1365.
Although section 14 of the Lloyd’s Act of 1982 exempts the Corporation of Lloyd’s (and its officers and employees) from liability in damages, Lloyd’s is not exempt for acts “done in bad faith.” As fraud requires bad faith, even with section 14, Lloyd’s remains liable in damages for fraud. Further, section 14 does not preclude the “grant of an injunction, a declaration or restitutionary relief against Lloyd’s,” and one of the. remedies under English law for misrepresentation is rescission. Thus, even for negligent misrepresentation, Appellants may rescind their contract.
Finally, section 14 of the Lloyd’s Act applies only to the Corporation of Lloyd’s and not to Members and Managing Agents. Although these entities are not named in this action, the Lloyd’s insurance market cannot function without them and thus suits against Members and Managing Agents will deter fraud by and lead to closer supervision by the entities named in this action.

2.Disclosure

English law provides Lloyd’s entities with adequate inducement to disclose material information to American investors because failure to do so gives rise to liability for breach of contract. The Members Agent’s Agreement requires each Members’ Agent promptly to provide information to Names regarding the Underwriting Syndicates. See Roby, 996 F.2d at 1366. Again, the Members Agents are not named in this suit. But the Lloyd’s structure imposes the disclosure duties on the Members Agents and thus adequately assures appropriate disclosure.

3.Compensation

English law allows Appellants to recover damages from Lloyd’s for fraud. Further, as an incident of a rescission remedy, Appellants may obtain indemnity against liabilities incurred. Additionally, Names have obtained judgments against Members and Managing Agents in England. See Arbuthnott v. Fagan & Feltrim Underwriting Agencies, Ltd., [1994] 3 Re LR 145; Deeny v. Gooda Walker Ltd., The Times, October 7, 1994 (Q.B. Commercial Ct.); Henderson v. Merrett Syndicates, Ltd., 1992 Folio 1496 (Q.B. Commercial Ct.); Henderson v. Merrett Syndicates, Ltd., [1994] 3 W.L.R. 761 (H.L.). Appellants claim that no Names have successfully enforced these judgments because the Agents are now insolvent. That the parties most easily sued in England are insolvent is indeed unfortunate. The Lloyd’s system met with global disaster in the wake of American asbestos litigation. That misfortune, however, does not commend itself as a reason to open up United States courts for the pursuit of solvent defendants in the plaintiff-friendly environment of California.
Without question, England imposes additional barriers to recovery and will thus not provide deterrence, disclosure, or compensation equal to that provided by the United *-148 States securities laws. However, the English regulatory structure and the remedies available in England are not so inadequate that enforcement of the ehoice-of-forum clause violates public policy. Cf. Howe v. Goldcorp Invs., Ltd., 946 F.2d 944, 952 (1st Cir.1991) (dismissing a securities case on forum non conveniens grounds even though there may be some differences between Canadian and American securities laws), cert. denied, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). Though a complex question with respect to the securities laws, English law does adequately protect the interests reflected in the American securities laws for those United States residents who elect to participate in English underwriting agreements.
C. RICO
The majority also remands for a determination whether “the Choice.Clauses are reasonable in their impact on the obligations established by RICO.” Again, I must respectfully disagree. The record provides sufficient information to determine the adequacy of English , remedies for a RICO claim. Although RICO provides treble damages not available in England, the remedies in England are adequate to prevent the fraudulent securities conspiracy alleged here. See supra Part II.B.; cf. Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 768-69 (9th Cir.1991) (holding that RICO claims may be dismissed on forum non conveniens grounds even when they would not be available in the alternative forum). Further; even to suggest that a plaintiff need only plead a cause of action under RICO to invalidate Choice Clauses in freely negotiated contracts defies reason. A party’s contractual choices cannot be so easily repudiated by artful pleading.

CONCLUSION

I concur in that part of the majority opinion which affirms the dismissal of the Blue Sky law, common law fraud, and breach of fiduciary claims, and agree with the majority that the clauses were not procured by fraud. However, I would affirm the district court across the board, and therefore I dissent from the reversal and remand.

. Appellants argue that their investment in Lloyd's is no different from an investment in any predominantly British company. However, other foreign companies do not have their own elaborate regulatory structure nor do other companies require investors to sign multiple agreements with foreign agents. Further, the Names knew they were subjecting themselves to this uniquely English regulatory structure.

. The issue before the Court involves the enforcement of the choice-of-forum clause on a Rule 12(b)(3) motion to transfer venue. The choice-of-law clause is relevant only because the incidental effect of enforcing the forum selection clause would lead an English court interpreting the choice-of-law clause to preclude operation of U.S. statutory law.

. Stewart Org., Inc. v. Ricoh, 487 U.S. 22, 28, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988), does not compel abandoning Bremen analysis in this situation. There the Court noted that the Bremen case “may prove instructive in resolving the parties' dispute,” Stewart, 487 U.S. at 28, 108 S.Ct. at 2243, and unlike 28 U.S.C: § 1404(a) at issue in Stewart, the antiwaiver provisions do not specifically address transfer of venue.

. The Leasco line of cases did not address the effect of international choice clauses on the applicability of the securities laws.

. Piper is a forum non conveniens case. If the possibility of an unfavorable change in the law does not control where the parties have not affirmatively selected a forum, then it certainly should not control where the parties have made a forum choice.